[No. 2675.]

## G. A. MAPES *v.* THE STATE.

1. CONTINUANCE—DILIGENCE.—That the defendant was called upon to announce for trial so soon after the presentation of indictment that service of process upon an absent witness in a distant county was impracticable, is a sufficient excuse for failure to sue out the process. See this case in illustration.
2. SAME—EVIDENCE—NEW TRIAL.—See the statement of the case for evidence set out in an application for a continuance, and in a motion for a new trial, which entitled the defendant to a new trial.
3. THEFT—FACT CASE.—See evidence held insufficient to warrant a conviction for theft of horses.

APPEAL from the District Court of Live Oak county. Tried below before the Hon. D. P. Marr.

The indictment charged the appellant with the theft of three horses, the property of John McKenzie, in Live Oak county, Texas, on the thirtieth day of September, 1881. The penalty assessed by a verdict of guilty was a term of five years in the penitentiary.

John McKenzie was the first witness for the State. He testified that, in September, 1881, he drove a bunch of his horses and mares from his home in Live Oak county to the San Antonio market, branding all of his colts save three before starting. On the eve of his departure he discovered that he required six animals to complete the number he desired to drive to San Antonio, and in order to complete this number, he included six of his most gentle horses. Of these, three were mares with colts. He separated the mares and colts, putting the mares in the herd to be driven, and the colts in his pasture at home. These three colts are the animals alleged to have been stolen. They in-

cluded two colts of about ten months of age and one filly about seven months of age. They were the property of Annie J. Mc-Kenzie, the daughter of the witness, but were at that time in the care and control of the witness  They were unbroken and unbranded, improved stock, and ran with a bunch of gentle horses before the witness drove their dams to San Antonio. The witness left these three animals in his own pasture when he went to San Antonio.

The witness lived in his own pasture, which was situated in the pasture of Mr. Fant. The witness had a good, smooth four wire and post fence around his pasture. The pasture of the defendant adjoined that of the witness, and was divided from it on one side by a wood fence. About six or seven miles from the witness's place, at Anderson's tank, there was a pen used for penning stock, and attached thereto was another pen used for catching mustang stock. The country adjacent to Anderson's tank was not a mustang range.

When the witness returned from San Antonio, he went into his pasture to look after his stock. The three colts he had left in that pasture were not there, but were subsequently found by the witness staked out in the defendant's pasture, each bearing the defendant's brand. The tongue of one of them had been badly injured. Witness then informed Neville Doby of his discovery, and requested Doby to go out and look at the animals. The witness at no time gave his consent to the defendant to take, use or brand these colts. He did not, at his house, about one week after his return from San Antonio, or at any other time or place, tell Pat Sheehan that he could not identify the colts as his property, or as the property of his daughter. He did not, when he returned John J. Fox's wagon which he had borrowed, tell Fox that he could not recognize or identify the colts as the property of himself or daughter. A suit was pending to try the right of property to these animals at the time of this trial.

The witness had never heard that horse stock was killed or injured by Fant's barbed wire fence in the summer and fall of 1881. Witness remembered one occasion on which Neville Doby went out found and drove up these three colts within three-quarters of an hour. Only half an hour was consumed in finding and driving them and their dams up when the witness started with the latter to San Antonio. When the witness first found these animals in the defendant's pasture on his return from

San Antonio, one of them got loose and started towards the witness's pasture at once. The animals were taken in Live Oak county, Texas, in September, 1881.

Neville Doby was the remaining witness for the State. He testified that he assisted McKenzie in driving a drove of horses to San Antonio in September, 1881. Preparing for that drive, they discovered that they needed six head of stock to complete the number desired, and to meet that demand, the witness, under direction of McKenzie, drove up, of gentle stock, three horses and three mares with colts. These colts they cut out and turned into McKenzie's pasture, and drove their dams and the three horses with the other stock to San Antonio. The colts described are those alleged to have been stolen by the defendant. The witness described the colts, McKenzie's premises and the surroundings, as they were described by McKenzie.

While the witness and McKenzie were in San Antonio with the drove of horses, the witness met the defendant in town (San Antonio), and was asked by him what McKenzie had done with the colts of the three mares he had with him. Witness replied that they had been left in the pasture at home. Several days after the return of McKenzie and the witness to the house of the former, McKenzie informed him that he had found his fine colts staked out in the defendant's pasture, and asked the witness to look at the animals. Witness did so, and identified them as McKenzie's colts, and as the colts of the three gentle mares which had been driven to San Antonio and sold—the same colts which were left in McKenzie's pasture. He found them at that time in the brush in the defendant's pasture, and in the defendant's brand. He asked the defendant whose colts they were, and he said that they were three mustang colts he had captured. Witness then told him that McKenzie owned them, and in reply the defendant asked: "Why in the hell don't Mr. McKenzie brand his colts?"

Witness was present at McKenzie's house about a week after their return from San Antonio, and heard a conversation between McKenzie and Pat Sheehan. He did not remember that McKenzie told Sheehan in that conversation that he could not identify the colts. If McKenzie made such a statement, the witness did not hear it. The witness had seen some mares injured by Fant's fence, but had known of none to be killed. Mustang stock ranged about Anderson's tank. The State closed.

Pat Sheehan was the first witness for the defense. He testi-

fied that about one week after the return of McKenzie and Doby from their trip to San Antonio with horses, he, the witness, was at McKenzie's house, in Live Oak county, and had a conversation with McKenzie, during the course of which McKenzie said that he could not identify the colts found in the defendant's pasture as his, but that Neville Doby could. There was a horse pen at Anderson's tank, six or seven miles from McKenzie's, to which was attached another pen, used for the capture of mustang stock which ranged about the neighborhood. The tank was inside of the horse pen, and the manner of capturing mustang stock was to drive them into the mustang pen when they went into the other pen to drink. Witness had seen many mustang horses so captured. A great many horses and mares were killed by Fant's barbed wire fence in the summer and fall of 1881, to the knowledge of the witness. McKenzie's fence was constructed of posts and four ooth wires, and was a good fence in general, but a part of the fence running between his pasture and that of defendant was of wood, and was part of a "buck-pen." Stock could break down and get through a smooth wire fence of four wires. Night was the best time for the capture of mustang stock. A man on foot could drive them from the tank into the pen in the manner described.

J. J. Fox testified, for the defense, that he loaned McKenzie a wagon when he, McKenzie, went to San Antonio with stock in the fall of 1881. When McKenzie returned the wagon, he told the witness that he could not identify the colts found in defendant's pasture; that he did not pretend to be a horse expert, but that Doby was. The range around Anderson's tank was a mustang range. The witness himself had captured there a ten year old mustang horse.

William James testified, for the defense, that he was with the defendant hunting horses one afternoon in the fall of 1881. Failing to find them, when they reached the tank, about dusk, they concluded to watch there that night for them, hoping they might come for water. About dark a bunch of horses, including three unbranded colts which both witness and defendant took to be mustangs, went into the outer or tank pen, and were driven into the mustang pen by the witness and defendant, and captured. Witness and defendant "tailed" them to other horses and took them to defendant's pasture, since when the witness has not seen them. They were unbroken and unbranded, ap-

parently about a year old, acted and looked like mustang stock, and were believed to be such, and were taken by the witness and defendant as mustang stock.

The motion for a new trial was supported by affidavits supporting the following facts:

The affidavit of J. E. Bartlett alleged that about September 1, 1881, he purchased of one Chapa forty-odd head of horses and mares. About five or six of the bunch were horses and the remainder mares. There were about thirty colts with the mares, which he did not purchase. He cut the colts out from the mares, and released them without branding the m. He drove the stock purchased from Chapa to the San Antonio market, leaving four head at home. On his return from San Antonio he found the four head gone. He went to Chapa's range, hunting them. Chapa went with him, and they found some of Chapa's colts and branded them. Chapa lived about four miles from Anderson's tank. When these four horses got away from affiant, he lost also a lot of unbranded colts. There is a mustang pen at Anderson's tank, used for the purpose of capturing wild horses. It is a common thing for young or untamed mustang colts without dams to take up with branded or gentle stock, and for gentle colts without dams to take up with mustang stock. In mustang ranges it is the custom to take up and brand unbranded colts without dams.

The affidavit of P. Chapa set out that in September, 1881, he had in the Anderson tank range some colts which were the offspring of mares he sold to Bartlett, some of which were afterwards found in that range. Mustang or wild stock stay in the range about the tank. Affiant knew personally of two bunches. Gentle and mustang stock frequently get so mixed that it is natural to mistake the one for the other. During that fall affiant saw four of the animals he sold Bartlett in McKenzie's pasture, and in a day or two afterwards saw the same four animals with a motherless unbranded colt at Anderson's tank.

Affidavits of other parties established the character of the country adjacent to Anderson's tank to be that of a mustang range; and in two affidavits it was affirmed that McKenzie, after his return from San Antonio, told the affiants that he could not identify the colts found in defendant's pasture, but that Doby could.

W. C. Anderson deposed that the defendant came to his place in the latter part of September, 1881, and inquired if witness ha

seen his certain sorrel horse. Witness replied that he had not, but that if the horse was in the range he was probably at the tank. Later in the day witness saw the horse at the tank, and so informed the defendant the next day. Defendant replied that he too saw the horse, and that he and James caught three mustang colts at the tank pen the night before. Affiant told defendant then that he expected that McKenzie would "get after him" about the colts, and defendant replied that there was not a horse in the bunch attending the colts in McKenzie's brand. Witness told defendant McKenzie would "get after him," because he heard McKenzie, some time before, send word to William Cavitt, who had penned mustang horses in that range, to let them alone, as they belonged to him, McKenzie. Witness gave McKenzie permission to build the mustang pen at the tank. There was a mustang range around the tank.

The application for continuance set up that the defendant expected to prove by the absent witness that he, defendant, caught the animals alleged to be stolen from a drove of mustang horses west of the Nueces river, in Live Oak county, Texas, and that they were mustang colts, unbranded, and had no owners.

Motion for new trial set up three grounds, viz:

First. That the court erred in overruling the application for a continuance.

Second. That the court should grant a new trial on account of the newly discovered evidence embraced in the affidavits attached.

Third. That the verdict was contrary to law and evidence.

*Eckford & Newton,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. This conviction was for the theft of three colts, the property of one John McKenzie. The indictment was filed on the fourteenth day of March, 1882. The cause was reached and defendant required to announce on the seventeenth of the same month. He moved for a continuance to procure the testimony of a witness who resided in Live Oak county, but who had gone, prior to the presentation of the indictment, and was then temporarily in the county of Presidio. "No process had issued, because it could not reach the witness in time for trial."

. Were the above facts sufficient to excuse the failure to issue process? We are of the opinion that they were. The law does not require a party to endeavor to accomplish that which is physically impossible.

Were the facts expected to be proven material and probably true? By reference to the statement of facts it will be found that there is but little if any conflict between the evidence of the absent witness and that introduced by the State; and it will most clearly appear that the facts alleged in the motion are material and of the first importance. We are of the opinion that the court erred in overruling defendant's motion for a new trial, based upon his motion for a continuance, especially as it was the first application.

Does the evidence support the verdict? We have given the statement of facts our most careful consideration, and from it have reached the conclusion that the important and necessary facts, and those without which, under the circumstances of this case, no legal conviction could be had, are in harmony with the facts sworn to by the witness for defendant, and that, viewed as a whole, the innocence of defendant is made to harmonize, consist, or stand with each and every important fact in the record. It is true that there are some trivial circumstances, incapable of producing an effect greater than suspicion, which are in conflict with and are not reconciled by the evidence for the defendant. Rare indeed would be the case which did not present this attitude or condition.

Again, taking all of the evidence together and viewing it as the case submitted, the fraudulent intent, the *animo furandi*, does not appear. We are therefore of the opinion that the court below should have granted the motion for new trial.

(The Reporters will give the statement of facts.)

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered May 2, 1883.